### In re the OHIO CORRUGATING COMPANY, Debtor.

### Bankruptcy No. B85–00900–Y.

United States Bankruptcy Court, N.D. Ohio.

April 12, 1990.

Steelworkers of America, AFL–CIO, CLC ("the Union"). For the reasons set forth below, the Union's claim is determined to be limited by the statutory amounts set forth in 11 U.S.C. §§ 507(a)(3) and (a)(4), and no portion of the Union's claim is found to be an administrative expense under 11 U.S.C. § 503.

Mary Beth Houser, Youngstown, Ohio, for debtor.

Mark Schlachet, Cleveland, Ohio, for Official Creditors Committee.

Mark A. Rock, and David M. Fusco, Cleveland, Ohio, for United Steelworkers of America, AFL–CIO, CLC.

Steven A. Weiss, Office of the General Counsel, Washington, D.C., for Pension Benefit Guaranty Corporation.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

The matter before the Court is the Debtor's Objection to the claim of The United

## FACTS

The Debtor, a manufacturer of steel barrels for the chemical and agricultural industries, filed its Petition for relief under 11 U.S.C. Chapter 11 on September 30, 1985. It soon became apparent that reorganization was not possible and the Debtor discontinued operations at its Warren, Ohio, plant on October 4, 1985. No business was transacted by the Debtor after December, 1985, and subsequently, the assets of the Debtor were liquidated.

The Debtor was a party to a collective bargaining agreement with the Union. The Debtor has not rejected the collective bargaining agreement pursuant to the procedures set forth in 11 U.S.C. § 1113. On January 29, 1986, the Union filed a class Proof of Claim in the amount of Six Hundred Sixty–Seven Thousand Six Hundred Fifty–Eight and 44/100 Dollars ($667,658.44) for wages, severance pay, vacation pay and medical and dental costs it claims are due under the collective bargaining agreement.[1] On October 12, 1989, the Debtor filed an objection to the Union's claim, asserting that no portion of the Union's claim is entitled to payment as an administrative expense, that wages (including vacation and severance pay) are limited to Two Thousand Dollars ($2,000.00) per individual under 11 U.S.C. § 507(a)(3), and that the Union should file an accounting detailing the amounts claimed under §§ 507(a)(3) and (a)(4). In one of the memoranda it filed on this issue, the Union stated that the correct amount of its claim is Three Hundred Three Thousand One Hundred Twenty–Six and 85/100 Dollars

---

1. Class proofs of claim have been held to be permitted in bankruptcy cases. *Reid v. White*

*Motor Corp.*, 886 F.2d 1462, 1469 (6th Cir.1989).

($303,126.85) which is broken down as follows:

Severance Pay           $154,513.12
Post–Petition Wages (for 09/30/85—the day of the filing of the Petition)   944.16
Pre–Petition Wages    40,481.37
1985 Vacation Pay     19,546.70
1986 Vacation Pay     78,411.55
Medical and Dental Claims    9,229.95

TOTAL           $303,126.85

The Union contends that this Court should authorize the payment of the entire amount under 11 U.S.C. § 1113(f); however, should this Court hold otherwise the Union states that it will submit a breakdown of the claims that are entitled to priority pursuant to 11 U.S.C. §§ 507(a)(1), (3) and (4).

## DISCUSSION

The primary issue in this dispute is rather simply stated but not so simply resolved. That issue is whether in a Chapter 11 proceeding where the debtor-in-possession is liquidating, 11 U.S.C. § 1113(f) gives claims under an unrejected collective bargaining agreement a priority separate from and above those priorities already enumerated in 11 U.S.C. § 507. The Union claims that § 1113(f) does indeed create the quintessential first priority to be paid even before the administrative expenses allowed under 11 U.S.C. § 507(a)(1). The Debtor asserts that the application of § 1113(f) in such a manner only to a liquidating Chapter 11 debtor would abrogate the statutory distribution priorities established in § 507.

As the Sixth Circuit Court of Appeals noted in *In re Unimet Corp. (United Steelworkers of America v. Unimet Corp.)*, 842 F.2d 879 (6th Cir.1988), "[a] discussion of 11 U.S.C. § 1113 is not complete without consideration of the circumstances precipitating its enactment." The Sixth Circuit's summary of those circumstances is worthy of repeating here:

> In 1984, the Supreme Court decided *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, (1984). Although the Court unanimously agreed that an unexpired collective bargaining agreement is an executory contract which could be rejected pursuant to

11 U.S.C. § 365(a), it split 5–4 on the issue of whether the debtor-in-possession could be found guilty of an unfair labor practice if it rejected the agreement prior to court approval. The majority concluded that the imposition of such sanctions would deprive the debtor-in-possession of the flexibility contemplated by the Bankruptcy Code.

.     .     .     .     .

The legislative response to *Bildisco* was swift. Only five months after the decision, Congress enacted 11 U.S.C. § 1113 as part of the 1984 amendments to the Bankruptcy Code. Subsection 1113(a) provides that the trustee or debtor-in-possession "may assume or reject a collective bargaining agreement only in accordance with the provisions of this section." Subsection 1113(b) requires the trustee or debtor-in-possession to make a proposal to the union providing for employee benefit modifications that are necessary to permit the reorganization of the debtor and to assure that all creditors, the debtor, and all other affected parties are treated fairly.

.     .     .     .     .

Subsection 1113(c) provides that the court shall approve an application for rejection of the collective bargaining agreement only if it finds that the debtor-in-possession has made a proposal that fulfills the requirements of subsection (b); that the union has refused to accept the proposal without good cause; and that the balance of the equities favors rejection of the contract.

.     .     .     .     .

Finally, subsection 1113(f) provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." (emphasis omitted).

Here, the Union relies heavily on language in *Unimet* to support its position. In the *Unimet* case, a Chapter 11 debtor-in-possession filed an application to pay insurance premiums for retiree benefits pursu-

ant to a collective bargaining agreement as an administrative expense. The DIP then, in effect, argued against its own motion by claiming that the payment of the retiree insurance premiums could not be characterized as an administrative expense. The Sixth Circuit held that Section 1113 encompasses retiree benefits, and, therefore, it was not necessary for the premiums to qualify as an administrative expense because they were payable under § 1113.

> [O]ur conclusion that 11 U.S.C. § 1113 encompasses retiree benefits leads to the conclusion that qualification as an administrative expense is not necessary for the union to prevail. As discussed above, section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement. Accordingly, we hold that *Unimet* cannot escape its obligations in this regard merely because of the requirements of section 503 arguably have not been satisfied.

*Unimet*, 842 F.2d at 884. (emphasis in original; footnote omitted).

The Union argues that the Sixth Circuit's finding mandates the payment of its claim immediately, irrespective of its qualification as an administrative or other priority. The Debtor-in-Possession in the present case urges us to find that the *Unimet* decision was limited to the facts found in that case. We must agree with the Debtor. We give much deference to the findings of the Sixth Circuit in the *Unimet* case, and we note that the broad language quoted above does indeed appear to be persuasive authority for the Union's position. Nonetheless, the Union is asking us to find that the effect of § 1113, as applied by the *Unimet* decision, is to give the Union a super-priority outside of § 507. This result would be a radical departure from the scheme of the Bankruptcy Code and the issue of whether Congress intended such a

result was not before the Court in *Unimet.* A primary issue in that case was whether § 1113 applied to retiree benefits,[2] and the Sixth Circuit inquired into this section's legislative history with respect to that issue alone. Because the *Unimet* case involved neither a liquidating Chapter 11 nor the pervasive question of a super-priority, this Court believes that the general language contained in the *Unimet* decision is not dispositive of the case at bar.

The Union also relies on *Matter of Canton Castings, Inc.*, 103 B.R. 874 (Bankr.N.D.Ohio 1989), in support of its argument. As Chief Judge Williams stated, the issue in that case was "[m]ay the Debtor pay vacation benefits to hourly employees covered by a valid and subsisting collective bargaining agreement, which benefits were accrued prior to bankruptcy but are as yet unpaid?" *Canton Castings*, 103 B.R. at 875. Relying on *Unimet*, the Court determined that the debtor-in-possession was obligated to pay such benefits: "The debtor is operating an ongoing business, in which it is subject to the terms of a collective bargaining agreement. It has made no effort to reject that agreement and until it does, it is bound thereby." *Canton Castings*, 103 B.R. at 876.

The Debtor in the present case urges us to distinguish *Canton Castings* based on its factual differences from the case at bar. Again, we must agree because to apply the general conclusions of *Unimet* and *Canton Castings* to a case involving a liquidating Chapter 11 debtor would, as noted above, create a super-priority, an issue not considered by either Chief Judge Williams or the Sixth Circuit. Indeed, that the debtor-in-possession in *Canton Castings* was operating an ongoing business appears to have been important to the Court's decision. Part of the Court's conclusion previously quoted here notes that "in [the debtor's ongoing business] it is subject to the

---

**2.** Since the *Unimet* decision was rendered, Congress enacted 11 U.S.C. § 1114 as part of the Retiree Benefits Bankruptcy Protection Act of 1988. This section deals specifically with retiree benefits and would appear to make the applicability of § 1113 to those benefits a moot issue. In *Unimet*, the Court discusses the effect

of then recently enacted Public Law 99–591. That statute was intended as a stopgap measure to enable Congress to develop what eventually became § 1114. *See* S.REP. NO. 119, 100th Cong., 2nd Sess. 1–7 (1987), U.S.Code Cong. & Admin.News 1988, p. 683.

terms of a collective bargaining agreement." Chief Judge Williams also refers to the Debtor's ability to pay "ordinary course of business" expenses pursuant to 11 U.S.C. § 1108. *Canton Castings*, 103 B.R. at 876.

Finally, the Union urges us not to draw a distinction between reorganizing Chapter 11 debtors and liquidating Chapter 11 debtors. In this regard, the Union points to the fact that § 1113 draws no such distinction and that in *In re St. Louis Globe–Democrat, Inc.*, 86 B.R. 606 (Bankr.E.D.Mo. 1988), wages, vacation and severance pay were paid pursuant to § 1113 despite the fact that the case had converted to one under Chapter 7. Although § 1113 contains no reorganizing-liquidating distinction, the practical effect of the application of § 1113 in the manner proposed by the Union to the liquidating Debtor here is radically different than its application in any of the three cases cited by the Union, including *Globe–Democrat*. In that case, the court determined that certain wages, vacation and severance pay were payable *as expenses of administration* under 11 U.S.C. § 507(a)(1).[3] The Court did not consider whether § 1113(f) mandates the payment of wages, vacation and severance pay outside of and ahead of the § 507 priorities as the Union asserts here.

Having determined that none of the cases cited by the Union is dispositive of the case at bar, we now turn to other case law interpreting § 1113(f) and the *Unimet* decision. We find only one, *In re Murray Industries, Inc. (Shipwrights, Joiners & Caulkers Local 2071 v. Uniflite, Inc.)*, 110 B.R. 585 (Bankr.M.D.Fla.1990). In that case, the debtor laid off virtually all of its hourly employees shortly after the filing of its Chapter 11 petition. The Union in *Murray Industries* claimed that vacation pay earned by the laid-off employees was immediately payable, and it relied on the same cases cited here, *Unimet, Canton Castings*, and *Globe–Democrat*. But unlike those cases, in *Murray Industries* the

bankruptcy judge considered the conflict between §§ 1113(f) and 507:

> [I]f by virtue of § 1113(f) of the Code, a Chapter 11 debtor must pay vacation pay earned to laid-off employees immediately, this Section is in direct conflict with the treatment of claims established by the Bankruptcy Code, especially with the priority scheme established by § 507 and § 1129(9)(B).

*Murray Industries*, 110 B.R. at 587. Judge Paskay looks to the legislative history and construction of 11 U.S.C. § 1114 in order to discern the legislative intent behind § 1113. Because § 1114, unlike § 1113, contained explicit language exempting payment of retirement benefits from other provisions of the Code and also affirmatively mandated the payment of those benefits, Judge Paskay concluded that this was "evidence that Congress did not intend § 1113 to be exempt from the operation of other sections of the Code, including the priority set forth in § 507(a)." *Murray Industries*, 110 B.R. at 587. Judge Paskay also notes:

> One of the central themes of the Bankruptcy Code is equality of distribution ... "if one claimant is to be preferred over others, the purpose should be clear from the statute. To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution, it dilutes the value of the priority for those creditors Congress intended to prefer."

*Murray Industries*, 110 B.R. at 587 (quoting *In re Mammoth Mart*, 536 F.2d 950, 953 (1st Cir.1976)). Judge Paskay concluded:

> This Court is satisfied that the better view is one which reconciles § 507 with § 1113 and that § 1113 governs only the conditions under which a Debtor-in-Possession may modify or reject a collective bargaining agreement, but that payment of employment-related pre-petition obligations is governed exclusively by § 507. Even accepting, without conceding, that

---

**3.** The Union in the present case argues in the alternative that if its claim is not payable immediately under § 1113(f) then it is an administrative expense under 11 U.S.C. § 507(a)(1). Our findings on this issue are discussed below.

the failure to pay the vacation pay benefits at this time, in fact, modifies or alters the terms of the Agreement in order to preserve the rehabilitative aims of Chapter 11, then § 507 must prevail.

*Murray Industries,* 110 B.R. at 588.

We agree with Judge Paskay's conclusion. Despite the general language in § 1113(f) and the *Unimet* decision, the unavoidable result of the Union's request for immediate payment of wages, vacation and severance pay would be a direct conflict between §§ 1113 and 507. Such a conflict is to be avoided unless supported by clear congressional intent.

> ... when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible.... The intention of the legislature to repeal 'must be clear and manifest.'"

*Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (quoting *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)).

Where Congress has intended to create a super-priority outside of § 507, it has done so explicitly. For example, in 11 U.S.C. § 364(c), Congress gives the Bankruptcy Court the power to authorize the obtaining of credit "with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title...." At the very least, as Judge Paskay points out, § 1113 could have mandated *payment* notwithstanding other provisions of Title 11. Rather, § 1113(f) appears to be a direct and limited response to the Supreme Court's findings in *Bildisco.* There, the Supreme Court concluded that "from the filing of a petition in bankruptcy until formal acceptance, the collective-bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d)." *Bildisco,* 465 U.S. at 532, 104 S.Ct. at 1199. The Court's rationale was

that to allow enforcement of the collective bargaining agreement (which, it concluded, the action under § 8(d) was intended to achieve) would be to deprive the debtor of the flexibility contemplated by the Bankruptcy Code. In order to remedy this construction, Congress enacted § 1113 with its rejection procedure and its addendum, subsection (f), that "[n]o provision of this Title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." Both *Bildisco* and § 1113(f) contemplate the circumstances under which an *ongoing business* may alter the provisions of a collective bargaining agreement.

Section 1113 of the Bankruptcy Code was amended by Congress in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco* ... which dealt only with the issue of whether an unexpired collective bargaining agreement was an executory contract which could be unilaterally rejected by a debtor-in-possession pursuant to 11 U.S.C. § 365(a), and was not intended to modify the scheme of distribution of the Code.

*Murray Industries,* 110 B.R. at 588. (citation omitted). The statute, for example, requires the debtor-in-possession to make a proposal of the modifications "that are necessary to permit the reorganization of the debtor," and it allows the court to authorize interim changes "if essential to the continuation of the debtor's business." 11 U.S.C. § 1113(b)(1)(A) and (e).

What little legislative history exists with respect to § 1113 indicates no congressional intent to supersede or modify the existing § 507 priorities. Indeed, the remarks of Congressman Morrison suggest the compatibility of § 1113 with § 507. He stated that where "an application for rejection is denied by the court after a hearing on the merits, the covered employees are entitled to their wages and benefits lost by employer unilateral action as an administrative expense." 130 CONG REC. H7496 (daily ed. June 29, 1984).[4] No mention is made of

---

**4.** Presumably, Congressman Morrison was referring to post-petition wages and benefits lost

by employer unilateral modification which is prohibited by § 1113(f) and not pre-petition

the immediate payment of claims or of the payment of wages, vacation and severance pay in any manner inconsistent with that established by § 507.

Our conclusion that § 1113 governs only the conditions under which a debtor may modify or reject a collective bargaining agreement and does not mandate the payment of employment related pre-petition obligations appears to create an exception to the general application of § 1113. Nonetheless, this appears to be the only way to reconcile the two statutes which must be done unless Congress directs otherwise. Furthermore, a finding in favor of the Union in this case would leave in its wake a series of anomalous results. Why, for example, should the very same pre-petition obligations receive an unlimited first priority if the employer debtor files under Chapter 11 but only a third or fourth priority, limited in dollar amount per employee, if the case is filed under Chapter 7? There is no reason, intended by Congress or otherwise, to disrupt the certainty of the distribution scheme of the Bankruptcy Code in this manner.[5] In the present case, the fund that is available for distribution, created largely through the efforts of the Unsecured Creditors Committee, would be exhausted if the entire amount of the Union's claim was payable immediately. There would be insufficient funds to pay administrative expenses, which hold a first priority for the obvious reason of encouraging the professional administration of the bankruptcy estate. If post-petition administrative expenses can be, in effect, wiped out by pre-petition employment related obligations a strong disincentive to reorganization under Chapter 11 would be created.

■ Finally, the Union argues in the alternative that two portions of its claim are payable as a first priority administrative expense under 11 U.S.C. §§ 503 and

507(a)(1). First, the Union claims that the amount of Nine Hundred Forty–Four and 16/100 Dollars ($944.16) is owed as post-petition wages earned on one day, September 30, 1985, the date the petition was filed. We note that the presumption is often to the contrary—that activities on the date of filing are considered pre-petition. However, if the Union wishes to itemize those wages earned after the petition was filed at 4:40 p.m. on September 30, 1985, the Court will consider that amount as a post-petition wage claim. Second, the Union claims that there is authority for assigning the severance pay obligation an administrative priority on the basis that it was earned by the employees on the date of termination, which was post-petition. As a bankruptcy court in this Circuit has noted, "[t]he First, Third and Ninth Circuits have held that severance pay claims should not be accorded priority status just because the right to payment arose post-petition. However, the Second Circuit has accorded priority to severance pay claims in full as costs of administration." *In re Microwave Products of America, Inc.*, 100 B.R. 379, 383–384 (Bankr.W.D.Tenn.1989) (citing *In re Mammoth Mart*, 536 F.2d 950 (1st Cir.1976); *In re Public Ledger, Inc.*, 161 F.2d 762 (3rd Cir.1947); *In re Health Maintenance Foundation*, 680 F.2d 619 (9th Cir.1982); *Straus–Duparquet, Inc. v. Local Union No. 3, International Brotherhood of Electrical Workers*, 386 F.2d 649 (2d Cir.1967)) *Microwave Products* went on to hold that the severance pay claim in question was not entitled to priority status. The only Sixth Circuit case on this issue appears to be a case under the Bankruptcy Act, *In re AD Service Engraving Co. (Arabian v. Coleman)*, 338 F.2d 41 (6th Cir.1964). There, the court determined that a form of severance pay was not entitled to priority status. We must agree with the clear majority of courts that severance pay is not

claims, which the Union here asserts in the alternative are payable as an administrative priority.

**5.** The Debtor asserts that the Unsecured Creditors Committee would be compelled to seek a conversion of this case to Chapter 7 to avoid the application of § 1113 if the Union is successful

here. The Union referred to this as an inappropriate threat, but, nonetheless it argued that its claim would not lose its super-priority status upon conversion. That issue need not be decided here, but it further illustrates the disparate treatment of claims which would result if the Union's interpretation of § 1113 is accepted.

entitled to priority status simply because the right to payment arises because of a debtor's post-petition action. The better view· is the one proposed by the debtor:

> An employee earns the right to severance pay and vacation pay as the employment relationship progresses. Such rights are not "earned" on the day the employee is terminated or at the time the employee takes a vacation.[6]

*In re Chicago Lutheran Hosp. Ass'n*, 75 B.R. 854 (Bankr.N.D.Ill.1987).

█ Furthermore, the severance pay in question there was not supported by consideration supplied post-petition, nor did it confer benefit on the Debtor-in-Possession. *See Mammoth Mart*, 536 F.2d at 955; *In re Crouthamel Potato Chip Co.*, 52 B.R. 960, 966 (E.D.Pa.1985). Therefore, no portion of the Union's claim is entitled to priority status, except those wages which can be demonstrated to have been earned post-petition.

An appropriate Order shall issue.

---

**6.** This would appear to be what Congress intended. Former Section 64(a)(2) gave priority to unpaid wages while vacation pay was not mentioned. Nonetheless, it was generally accepted that vacation pay constituted wages and was earned from day to day within the pre-petition period set by § 64(a)(2). *See,* 3 *Collier on Bankruptcy* § 507.03[3][e] (15th Ed.1989). Congress then enacted 11 U.S.C. § 507(a)(3) to read "... claims for *wages,* salaries, or commissions, *including* vacation, severance, and sick leave pay—(A) earned ... within 90 days...." (emphasis added). The plain meaning of the statute would suggest that vacation and severance pay are to be treated as benefits earned with wages.